HELVERING, Commissioner of Internal Revenue, v. INSULAR SUGAR REFIN-ING CORPORATION.

No. 8226.

United States Court of Appeals
District of Columbia.

Reargued Oct. 5, 1943.

Decided March 27, 1944.*

Mr. Frederic C. Rita, Special Assistant to the Attorney General, pro hac vice, by special leave of court, with whom Messrs. Samuel O. Clark, Jr., Assistant Attorney General, and Sewall Key, Special Assistant to the Attorney General, were on the brief, for petitioner.

Mr. J. Sterling Halstead, of New York City, for respondent.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

GRONER, C. J.

This is a petition by the Commissioner of Internal Revenue to have us review and reverse a decision of the Processing Tax Board of Review, determining that respondent is entitled to a refund of the sugar processing tax paid by it in the period September 12, 1934, to January 6, 1936, to the extent of $230,511.31. The case is this:

Respondent, which we shall call "claimant", was at the time in question a Philippine corporation, with its office and refinery in the Islands. It purchased there its raw sugar, processed it, and sold its product as to about fifteen per cent (15%) locally and the remainder, or about eighty-five per cent (85%), in the United States. In the period in question it paid a tax amounting to $549,561.24. When later the tax was held illegal, Congress promptly passed an act to provide the manner and conditions of refund.[1] By its terms, if the Commissioner denied refund, the taxpayer might have recourse to a statutory Board, with right of review in a Circuit Court of Appeals. In the latter case the court is authorized to affirm, reverse, or modify, if the decision of the Board "is not in accordance with law".

In this case claim for refund was first made in the amount of approximately

---

* This decision was delayed first by reason of the withdrawal from the court of Judge Vinson, who sat at the original hearing, and was later appointed Director of Economic Stabilization; and then by the pendency in the Supreme Court of the case of Bain Peanut Company v.

Commissioner, 64 S.Ct. 633, which was thought to involve the same issues, but was dismissed March 6, 1944.

[1] Title VII of the Revenue Act of 1936, Sec. 906, 49 Stat. 1648, 1748, 7 U.S.C.A. § 648.

$550,000 and denied by the Commissioner, after which claimant filed an amended claim with the Commissioner and later with the Board (on review) in the amount of $426,247.16.[2] Extensive hearings were held; many witnesses testified, including Government auditors and accountants; claimant's books, records and invoices were examined by Treasury accountants, as were also the books, records and invoices of claimant's sales agent in the United States. The hearings extended over a considerable period of time, and the Board thereafter made findings of fact and decided (three members dissenting) that claimant was entitled to a refund in the amount of $230,511.31 for processing taxes paid, the burden of which the Board found claimant had not shifted to others "in any manner." The Commissioner thereafter moved for rehearing and for additional findings, which after consideration the Board denied. The Commissioner then applied to this court for review.[3]

▉ The procedural part of the Act makes the decision of the Board "final in the same manner that decisions of the Board of Tax Appeals become final under section 1005 of the Revenue Act of 1926, as amended."[4] And of the finality of decisions of the Tax Board (now Tax Court), the Supreme Court has recently said:[5]

"All that we have said of the finality of administrative determination in other fields is applicable to determinations of the Tax Court."

No more sweeping statement of finality could be made, for an examination of the cases in which the Supreme Court has applied the rule in "other fields" leaves nothing to the imagination, and is a clear and definite mandate to the courts not to reweigh the evidence or pass upon the credibility of witnesses. Due respect for the rule—which, in duty bound, we have imposed upon ourselves in circumstances when we thought its relaxation would have better met the ends of justice—requires us, we think, to accept without interference findings of a Board which, as is the case here, have support in the evidence. Hence, it has seemed to us that since it can not be doubted that the issue here is wholly factual, and the thirty-one separate findings cover the case like a blanket, a proper regard for the rule requires its application. But we also think that there are other factors in the case which, given fair consideration, compel the same result.

▉ The Act of Congress we are considering provides that it shall be *prima facie* evidence that the burden of the tax was borne by the claimant, to the extent that the average margin per unit of commodity processed, figured by a formula which the Act prescribes, was lower during the tax period than the average margin was during the period before and after the tax period. On the other hand, if the average margin during the tax period was not lower, that fact is made *prima facie* evidence that no part of the tax was borne by the claimant, but was shifted. "Average margins" are comparative operating profits, ascertained by deducting the cost of the raw sugar from the market price of the refined sugar and eliminating from consideration overhead and other expenses of operation. Here the Board expressly found, and the fact is not only not disputed, but is admitted, that the average margin per unit (one pound of sugar) of the commodity processed was $.002244 lower during the tax period than the average margin per unit processed during the period before and after the tax.

We have, therefore, here a statutory *prima facie* case on which alone claimant is entitled to rely for refund until it is rebutted "by proof of the actual extent to which the claimant shifted to others the burden of the processing tax."[6]

---

[2] The tax was effective in the United States from June 8, 1934, but in the Philippines only from September 12, 1934.

[3] Sec. 906 of the Act of 1936, supra.

[4] Sec. 906 of the Act of 1936, supra.

[5] Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 246.

[6] Sec. 907(e), Act of 1936, 7 U.S.C.A. § 649(e), supra.

"Either the claimant or the Commissioner may rebut the presumption established by subsection (a) of this section by proof of the actual extent to which the claimant shifted to others the burden of the processing tax. Such proof may include, but shall not be limited to—

"(1) Proof that the difference or lack of difference between the average margin for the tax period and the average margin for the period before and after the tax was due to changes in factors other than the tax. * * *

"(2) Proof that the claimant modified existing contracts of sale, or adopted a new form of contract of sale, * * *."

Careful examination of the record wholly fails to show—except as to sugar sold in the Islands, as to which the Board found claimant had not borne the burden of the tax—and except as to a few inconsequential sales in the United States—one jot or tittle of proof of the extent, "actual" or otherwise, to which claimant, as to all the other sales, aggregating in value more than four million dollars ($4,000,000), and on which a tax was paid in excess of five hundred thousand dollars ($500,000), had shifted the burden, or been reimbursed therefor. And this was also the conclusion of the Board. Viewed in this light, the Board found that the statutory formula should be applied and this resulted in an order of refund of about one-half the tax paid.

In the case of the Philippine sales, claimant's invoices to customers showed as a separate item an amount equivalent to the amount paid by it as processing tax, and the Board held this enough to show that as to these sales the burden of the tax had been shifted. This applies to less than fifteen per cent (15%) of the sales. But the same condition did not apply in the case of American sales and the Board found, and the finding is not disputed, that in no instance did the processing tax appear as a separate item on any of the American invoices. The question then is— is there proof elsewhere that the tax burden was shifted? The Commissioner points to no instance and we find none. The course of business pursued by claimant was to ship its sugar by consignment to an agent in San Francisco, with branch offices and warehouses in various other ports on the Pacific Coast. As a result, claimant was authorized to draw on the agent by sight draft from eighty-five (85) to ninety (90) per cent of the San Francisco market value at time of shipment. These shipments did not begin until more than eight months after the tax became effective in the United States. For a part of the time after the imposition of the tax, claimant's memoranda to its agent included an item denominated "processing tax." But the uncontradicted evidence is, and the Board so found, that this item was disregarded in the sale of the sugar by the agent to the public, as well as in the monthly settlements between agent and claimant, and that payment was made to claimant on the basis of the actual sales price of sugar, less expenses and commissions, and that any excess or deficiency in the amount drawn by draft from Manila was adjusted by appropriate bookkeeping entries. In the light of this evidence, the answer to the question in what degree, if any, the price of sugar sold by the agent was increased solely by reason of the tax, does not appear, and as nearly as we can tell from anything that does appear, the question can be answered only by inference and guess. It does, however, appear that the current San Francisco market price for sugar in the effective month (June 8, 1934) was higher than the preceding month by approximately the amount of the tax, and this price, with fluctuations, held for some time. It may not be unreasonable, in this circumstance, to assume that the advance was due to the tax and that claimant got the advantage of this increased price, or some of it, to the extent that its sugar was sold in that period. But it is a fact and not a surmise that claimant did no processing and paid none of the tax involved in this case until February, 1935, nearly eight months after the tax was effective in the United States, and in that period the San Francisco market price had changed by a number of advances and by a number of recessions. The Board's finding on this subject is that the market price of sugar on the Pacific Coast is seasonable and is "determined entirely" by competitive conditions,[7] and by reference to the schedules made a part of the Board's findings, it appears that the price scale during the winter months of the year *preceding* the tax was about as high as in similar months after the tax became effective, and these were the months in which claimant's sugar was processed. In any case, the decision of the Board in reducing claimant's refund to fifty per cent (50%) of the amount of the tax paid, for reasons which we shall hereafter state, may very well have taken care of any assumed advantage it enjoyed as a result of the market advance. But however this may be, the burden of showing "the extent" of the shifting—if indeed shifting is shown by selling in a current market as to which claimant had no part in making or controlling—is, in the admitted facts of this case, by the statute put on the Commissioner, and it is perfectly clear he has not met it, and in that case the statu-

---

[7] Finding 17 of the Board.

tory average marginal formula must be applied if the Act of Congress is to be given effect.

How much of claimant's sugar in storage in San Francisco, or other Western ports, on June 8, 1934—the American date of the tax—was sold on the market advance at that time is of no consequence here, since the "floor tax" paid on that sugar is not in issue. As to it claimant asks no refund. But it is significant that, on the average, claimant's sugar processed after the effective day of the Act, sold considerably under the market prices prevailing when the tax became effective in the United States. And this is recognized by the Board in the finding that "petitioner [claimant] has proved that the actual proceeds derived from the sale of * * * sugar were substantially less than the theoretical gross sales value [i. e., market value] used in the computation," in determining the statutory average margin. All of this tends to show that claimant, whatever its anticipations may have been, was unable to increase its sales price over the increased cost of production, by reason in part of the increased cost of the raw sugar (some Twelve Cents ($.12) a bag), anywhere near the amount of the tax. As a result claimant sustained an actual out of pocket loss on every bag of sugar processed during the tax period. These various factors the Board considered in weighing the rebuttal evidence of the Commissioner. Nor does it by any means follow that the Commissioner's assumption, which we have said may be indulged, that the June 1934 advance in the market was attributable solely to the tax, is true. For, by the same process of reasoning, it would follow that when the tax was withdrawn, the market would decline. And this, as the record shows, it not only did not do, but instead, it actually advanced. In this aspect, it would be just as reasonable to ascribe the advance to the limitation of the supply *under the quota system which the Act imposed;* and this would be in accordance with the Board's finding that the price was largely competitive and dependent upon supply and demand. If, therefore, the case is to be decided on assumptions, the application should not be one-sided. But be that as it may, in the tax period as a whole, the actual price received by claimant per bag of sugar was equal to an advance of only a little more than one-half the amount of the tax, and when to this is added the additional price rise in the same period in the cost of the raw sugar, which Congress directed should be taken into account,[8] it seems to us to show that the advance in the market price for refined sugar did not by more than half absorb the tax. All of this indicates that if there was a shifting, it was certainly no greater than the amount by which the application of the "formula" reduced the amount of the refund. And this conclusion seems justified when it is borne in mind that in 1933, preceding the tax, claimant's profits were over $350,000, and for the half year after the tax, $130,000, whereas in the twelve months of the tax it sustained an out of pocket *loss* of over $55,000.

On the whole case, it is apparent that when Congress authorized the refund of the proscribed tax in such a way as to provide on the one hand proper reimbursement for money illegally exacted, and on the other hand to avoid unjust enrichment to any taxpayer, it was mindful of the difficulties of the task, for in the Report of the Senate Committee on the Bill it is said—"The question as to whether processing taxes were passed on, however, involves extremely complicated economic and accounting considerations."[9] In recognition of this fact Congress provided a simple formula which should apply in those cases in which complicated accounting considerations made it impossible to determine the precise question with reasonable certainty; and it constituted a Board of Treasury experts to apply the formula in a proper case.

No one reading the evidence and exhibits in the present case can doubt that here the Congressional anticipation was realized and the wisdom and fairness of the statutory formula vindicated. For certainly, on this record it would be but conjecture and surmise to say that the tax burden

---

[8] Revenue Act of 1936, § 907(b) (1) "* * * From the gross sales value of all articles processed by the claimant from the commodity during such month, deduct the *cost of the commodity processed* during the month and deduct the processing tax paid with respect thereto. The sum so ascertained shall be divided by the total number of units of the commodity processed during such month, and the resulting figure shall be the margin for the month." (Italics added.)

[9] Senate Report 2156, 74th Congress, 2nd Sess.

was shifted, or if it was, to what extent it was, and that was obviously the conclusion of the Board when it said:

"The decision of the Board is based upon the presumption which arises under section 907(a) of the Revenue Act of 1936. Both parties submitted evidence which may be considered to be in the nature of rebuttal of this presumption. It was admitted that the processing tax was billed separately with respect to sales of sugar made in the Philippine Islands, and the respondent adduced evidence which clearly shows that in certain other instances the processing tax was included in the sale prices; however, this showing is insufficient to account for the difference between the processing tax paid and the amount of refund as found under the provisions of Section 907(a). Moreover, the petitioner has proved that the actual proceeds derived from the sale of processing tax-paid sugar were substantially less than the theoretical gross sales value used in the computation of the margin for the tax period in accordance with the statutory formula. Because of factors such as these, and upon considering all of the rebuttal evidence, the Board is unable to find any 'proof of the actual extent to which the claimant shifted to others the burden of the processing tax' (Sec. 907(e)) sufficient to warrant a change in the amount of refund found due according to the statutory presumption."

Clearly, this language must be accepted as reflecting the Board's consideration and weighing of the Commissioner's and claimant's evidence, and of the application thereto of its expert knowledge; so that we have a case in which the Government illegally collected from claimant over $500,000, which in law and conscience it was obligated to repay to it, or to whoever had borne the burden of the payment. To determine the question, Congress adopted a formula, the application of which in doubtful cases it considered was sufficient to identify the loser and fix the amount of his recovery—unless the Commissioner should go forward and by satisfactory evidence show that his loss had been recouped. This the Commissioner has done only to the extent of showing a rise in the market price of the taxed product, equal to the tax, on or about the tax month *in the United States;* and on this showing he rests. This the Board considered and,

applying its special knowledge and experience, held insufficient on the weight of the evidence. And its conclusion, as our brother Hand recently remarked, "inevitably supersedes" that of a court *not similarly endowed.* Whether the reason of the rule assumes more than is true—ordinarily —opinions may differ, but in the "complicated economic and accounting considerations" recognized to exist in this case, two members of this court feel that its application here is altogether proper.

Affirmed.

EDGERTON, J. (dissenting).

The first section of the legislation which provides for "Refunds of Amounts Collected under the Agricultural Adjustment Act" repeals the pertinent parts of that Act. The second section, in effect, declares the policy of the new legislation. It provides that no refund shall be made of any amount paid as a tax "unless the claimant establishes to the satisfaction of * * * the Board of Review * * * That he bore the burden of such amount and has not been relieved thereof nor reimbursed therefor nor shifted such burden, directly or indirectly, (1) through inclusion of such amount by the claimant * * * in the price of any article * * *; (2) through reduction of the price paid for any such commodity; or (3) in any manner whatsoever * * *" [1]

A later section, 907(a), provides that if the claimant's "average margin per unit of the commodity processed" was less during the tax period than during certain preceding and following periods, that fact is "prima facie evidence" that he bore the burden of the tax to the extent of the difference. Sections 907(b) (1) and 907(b) (2), in effect, define "margin" as the extent to which the cost of the commodity before processing, plus tax if any, is less than the gross sales value of the processed commodity. Section 907(e) provides that the "presumption" established by § 907(a) may be rebutted by "proof of the actual extent to which the claimant shifted to others the burden of the processing tax. Such proof may include, but shall not be limited to * * * (2) Proof that the claimant modified existing contracts of sale, or *adopted a new form of contract* of sale, to reflect the initiation, termination, or change in amount of the processing tax, or at any such time *changed the sale price of the article* * * * *by substantially the amount*

---

[1] § 902, 49 Stat. 1747, 7 U.S.C.A. § 644.

*of the tax* or change therein, or * * * *billed the tax as a separate item to any vendee,* or *indicated by any writing* that the sale price included the amount of the tax * * *." [2]

Claimant's average margin per unit was less during the tax period than during the base period. This difference in average margins, multiplied by the number of units processed during the tax period, amounted to $230,511.31. The Board, "upon considering all of the rebuttal evidence," ordered a refund of this amount. It was "unable to find any 'proof of the actual extent to which claimant shifted to others the burden of the processing tax' (Sec. 907(e) sufficient to warrant a change in the amount of refund found due according to the statutory presumption." The Board's decision was expressly "based upon the presumption which arises under section 907(a)."

About 85 per cent of claimant's sugar was sold in the United States. On June 8, 1934, when the processing tax and the equivalent floor-stock tax [3] of 53½ cents a hundred pounds went into effect in the United States, claimant's American selling agent immediately raised the price of claimant's sugar by 55 cents. It raised it uniformly, at all points; San Francisco, Los Angeles, Portland, Seattle, and Tacoma. This increase was proved without dispute; but the Board's extensive findings do not refer to it, or to the related fact the market price on the Pacific coast rose to the same extent on the same day. The fact that the tax did not go into effect in the Philippines [4] until September 12 does not obviate the fact that upon the "initiation" of the tax in the United States claimant "changed the sale price of the article" in the United States "by substantially the amount of the tax." With respect to the 85 per cent of claimant's sugar which was sold in the United States, therefore, the "prima facie evidence" or "presumption" that, to the extent of the difference in claimant's margins, it bore the burden of the tax, was rebutted in a way in which § 907(e) provided that it might be rebutted. With respect to this same 85 per cent of claimant's sugar, claimant believed and repeatedly "indicated by * * * writing that the sale price included the amount of the tax." [5] The writings included contracts with some of claimant's customers. The presumption was therefore rebutted in a second way, and also in a third way, in which § 907(e) provided that it might be rebutted. The remaining 15 per cent of claimant's sugar was sold in the Philippines. On this sugar, claimant regularly "billed the tax as a separate item." With respect to this sugar likewise, therefore, the presumption was rebutted in a way in which § 907(e) provided that it might be rebutted. And even independently of § 907(e), the presumption was "out of the

---

2 Italics supplied.

3 "Upon the sale or other disposition of any article processed * * * that on the date the tax first takes effect * * * is held for sale * * * there shall be levied, assessed, and collected a tax * * * equivalent to the amount of the processing tax which would be payable with respect to the commodity from which processed if the processing had occurred on such date." 48 Stat. 31, 40, § 16(a), 7 U.S.C.A. § 616(a).

4 Claimant's refining was done in the Philippines, and the taxes now in suit were paid after September 12, 1934.

5 For example: "The above price is based on Government Processing Tax at the rate of 53½ cents per 100 pounds, and any change in this tax to be for the account of buyers."

"Above price of $4.25 basis San Francisco includes present Compensating Tax."

" * * * if we recover any processing taxes levied on sugar sold to you, on which said tax is included in the price, any amount recovered will be returned to you * * *"

"By agreeing to return any taxes we have paid and which may at some future time be returned to us, we are doing no more than could be expected * * *"

"The processing tax is a manufacturers tax and the wholesale buyers do not pay it, but only pay our wholesale price which has been increased by the tax. * * *"

" * * * all buyers should claim by the end of the year on P. T. Form 71 for taxes paid * * * provided always that they bore the burden of such taxes, and *did not pass them on to their buyers.*"

All the invoices which claimant sent to its American agent included the tax as a separate item, though the bills which the agent furnished to customers did not. Though the prices named in the invoices were not the prices at which the sugar was actually sold, they represented, as the Board found, what claimant "expected it might receive from the sale of sugar." The invoices were not bills, but they were of course "writings."

case"[6] as soon as proof was introduced which would support a finding that claimant shifted the entire burden of the tax. The evidence which I have just summarized would support, if not require, such a finding. It was confirmed by additional evidence which I summarize below. Both because of the provisions of § 907(e) and independently of § 907(e), therefore, in my opinion the evidence eliminated the presumption, as such, from the case. The difference in margins was not eliminated from the case, but it was only evidence, entitled to no artificial weight.[7] It follows that the Board's action in basing its decision upon the presumption was "not in accordance with law."[8] The decision should have been based upon the evidence.[9]

The opinion of the court, like that of the Board, rests on the premise that since the "prima facie evidence" or "presumption" was favorable to claimant, claimant was not required to prove that it bore the burden of the tax but the Commissioner was required to prove the contrary; in other words, when claimant established its prima facie case the burden of proof shifted from the claimant to the Commissioner. This premise seems to me erroneous. I cannot reconcile it either with the settled meanings of the terms "prima facie evidence" and "presumption" or with the basic enactment in the second section of the statute that "No refund shall be made or allowed * * * unless the claimant establishes * * * that he bore the burden of such amount and has not been relieved thereof nor reimbursed therefor nor shifted such burden * * *." The rebuttal section, 907(e), on which the court appears to rely, does not purport to limit that enactment. It purports, on the contrary, to limit the effect of the presumption. It is a legislative recognition of the fact that the particular types of evidence which it enumerates are, and others may be, "appropriate to overcome"[10] the presumption. I think the spirit and purpose as well as the letter of the Act are violated by holding,

as the court does, that a claimant who (1) immediately increases all his prices by the amount of the tax when it takes effect, (2) contracts with some of his vendees that he will refund to them the amount of the tax if the government refunds it to him, and (3) constantly recognizes, in other contracts and other writings, that he bears no part of the burden of the tax, should still be presumed to have borne a part of that burden.

The decision of the court rests upon the further premise that the Commissioner has not proved that claimant shifted the burden of the tax. This also seems to me erroneous. The other evidence in the case not only deprives the prima facie evidence of its artificial force as law, but also of its natural force as fact. It may be true that the shifting of a tax can seldom or never be proved to an absolute certainty and is not so proved in this case. But I think the fact that claimant shifted the entire burden of the tax is proved to so high a degree of probability that there is no rational basis in the evidence for any other conclusion.[11] In my opinion, therefore, the Board's decision should be reversed and the case need not be remanded for a decision upon the evidence.

The Act undertakes to make good to the taxpayer the burden of his tax payments. It does not undertake to compensate him for losses due to other causes. The fact that claimant's margins declined and its business became unprofitable during the tax period is the only basis in fact for an inference that claimant failed to shift the burden of the tax. It is not a sufficient basis.[12] There is no evidence whatever that the tax caused the margins to decline or the business to become unprofitable. There is strong, and I think conclusive, evidence to the contrary.

Claimant bought its raw sugar at Philippine market prices. Almost all of its American sales of refined sugar were made on the Pacific Coast and based, with certain discounts,[13] on San Francisco market

---

[6] Del Vecchio v. Bowers, 296 U.S. 280, 286, 56 S.Ct. 190, 193, 80 L.Ed. 229.

[7] Cf. American Law Institute, Model Code of Evidence, Rule 704.

[8] 49 Stat. 1750, § 906(g).

[9] Com'r of Internal Revenue v. Bain Peanut Co. of Texas, 5 Cir., 134 F.2d 853, certiorari granted 320 U.S. 721, 64 S.Ct. 36, dismissed 64 S.Ct. 633.

[10] Anniston Mfg. Co. v. Davis, 301 U.S. 337, 356, 57 S.Ct. 816, 825, 81 L.Ed. 1142.

[11] Cf. Williams v. United States, 99 Ct. Cl. 203, 48 F.Supp. 647.

[12] Cf. Vennell v. United States, D.C., 36 F.Supp. 646; Id., D.C., 38 F.Supp. 381, affirmed, 3 Cir., 122 F.2d 936; Insular Sugar Refining Corp. v. United States, 99 Ct.Cl. 345, 49 F.Supp. 319.

[13] The Board found that claimant's "actual proceeds derived from the sale of processing tax-paid sugar were substantially less than the theoretical gross sales

prices. It follows that if the tax (1) increased the market price of refined sugar in an amount equal to the tax and (2) did not increase the market price of raw sugar, then claimant shifted the entire burden which the tax imposed upon it. Accordingly, to say that claimant failed to shift the entire burden of the tax is to say either (1) that the price at which refined sugar could be sold in the market did not increase, by reason of the tax, to the full extent of the tax, or else (2) that the price of raw sugar did increase, by reason of the tax, to such an extent that the spread between the price of raw sugar and the price of refined sugar did not increase to the full extent of the tax. Neither of these propositions is true.

The San Francisco market price of refined sugar was controlled by two large refineries.[14] Accordingly on June 8, 1934, when the tax of 53½ cents took effect in the United States, the market price of re-

fined sugar in San Francisco went up from $4, where it had stood since May 24, to $4.55. The double coincidence, in time and amount, between the tax and the price increase precludes any other reasonable inference than that the tax caused the increase. Refined sugar continued to sell at $4.55 until November 25.[15]

On the other hand the market price of raw sugar for manufacture and export did not rise in the Philippines, where claimant bought its raw sugar, either on June 8 when the tax took effect in the United States or on September 12 when it took effect in the Philippines. According to the record it stood at $2.2956 throughout May and June, rose a fraction of a cent in July, fell off a little in August, and again fell off a little, to $2.2253, in early September. According to the record it remained practically constant during the half-month which followed September 11.[16]

value used in the computation of the margin for the tax period * * *" But it does not appear that the tax had anything to do with this fact. The Board did not find, and the evidence does not show, that claimant came nearer to realizing the "theoretical gross sales value" during other periods. On the contrary the Board found, without limitation to the tax period, that "The basic price of refined sugar on the Pacific coast is established by California & Hawaiian Sugar Refining Corporation, Ltd., and Western Sugar Refinery, the two largest refineries on the west coast. Under instructions and authority received from International Suchar Corporation, Balfour [petitioner's agent] sold petitioner's sugar at varying discounts, ranging from 5 to 15 cents per cwt., under the prices established by these two companies. This difference in price was necessitated principally by the fact that petitioner had for sale only granulated sugar in bags of 100 pounds each or in 100-pound bags containing units of 5, 10, or 20 pounds each and did not have for sale assortments such as cubes, brown sugar, and powdered sugar. * * *

"The sales of sugar by petitioner to International Suchar Corporation and Refined Syrups, Inc., * * * were not arm's-length transactions. Petitioner's prices to those two purchasers were always substantially lower than the prices then obtaining for the petitioner's sugar on the Pacific coast." Board findings 18, 22.

The Board did not segregate the pro-

ceeds of claimant's sales to its two affiliates, or inquire to what extent the decline in claimant's margins may have been caused by larger arbitrary discounts to them during the tax period than during the base period.

[14] Note 13 supra.

[15] The opinion of the court points out that the price of refined sugar did not decline when the tax was withdrawn. But the effect of the imposition of the tax, and the effect or lack of effect of its withdrawal, are two distinct questions. Only the first concerns us. The record does not show what kept the price up when the tax was withdrawn. But it is common knowledge that prices may remain up for a time, after removal of the pressure which caused them to rise, simply because purchasers have become accustomed to the prices and the "traffic will bear" them. This tendency is of course most marked when control of the sellers' side of the bargain is concentrated in a few hands. The Board found that "The basic price of refined sugar on the Pacific coast is established by California & Hawaiian Sugar Refining Corporation, Ltd., and Western Sugar Refinery, the two largest refineries on the west coast."

[16] The record does not show any Philippine price of raw sugar for manufacture and export between September 27, 1934, and January 26, 1935. Claimant did no processing for export, and the record perhaps implies that none was done, between September 11, 1934, and the end of January, 1935.

Thus the spread between the Philippine market price of raw sugar for manufacture and export and the San Francisco market price of refined sugar increased at once, by the amount of the tax, when the tax took effect in the United States, and did not decline for several months. The same is true of claimant's margins. I think this precludes any other reasonable inference than that the market spread, and claimant's margins, increased by reason of the tax to the full extent of the tax. In other words, claimant shifted the entire burden of its tax payments.

Throughout the tax period, claimant frequently declared that it was shifting the entire tax burden.[17] Accordingly it made contracts with some of its customers to pay over to them any tax refund which it might obtain in respect to the sugar which it sold them. Apparently claimant did not make many such contracts; but customers with whom it did make them paid the same prices as claimant's other customers. One of the anomalies of this case is that if claimant obtains a refund on the theory that it did not pass on the entire tax burden it will, because of its contractual recognition of the fact that it did pass on the entire tax burden, pay over to some of its customers so much of the refund as relates to their purchases.

In the course of the tax period, the price of refined sugar fell as low as $4.20 and rose as high as $5. On the average it approximately retained the June 8 tax increment of 55 cents. The last pre-tax price, $4 on June 7, 1934, was 40 or 50 cents lower than the price had been a year previously. During the tax period, the price (less tax) did not entirely regain what the price had lost before the tax went into effect. Accordingly the average price, less tax, during the tax period as a whole was lower than the average price during the preceding year or two years. The decline in claimant's margins was largely due to this fact. To attribute this fact to the tax would be to assert that if there had been no tax, the range of prices from June 8, 1934, to January, 1936 (the tax period) would have been the same that it was during the previous years.

There is no basis for any such assumption. It cannot rationally be assumed, for example, that although the actual price ($4.55) less tax (53.5 cents) between June 8 and November 25, 1934, was $4.015, if there had been no tax the price would have ranged between $4.40 and $4.75 as it had done in the corresponding part of 1933; for the price on June 7, 1934, was only $4, whereas on June 7, 1933, it had been $4.40 or $4.50.

In the tax period as a whole, the price of raw sugar was somewhat higher, on the average, than it had been during the previous two years. But neither the claimant nor the Board nor this court suggests that the tax was or could have been responsible for any increase in the price of raw sugar. All the evidence is the other way. Throughout the parts of the tax period in which the increases took place, the amount of the tax remained stationary. In the aggregate, the increases exceeded the amount of the tax by more than 50 per cent.[18] Thus there was no coincidence, either in the time or in amount, between the tax and the increases in the price of raw sugar. Sharp increases in that price were not confined to the tax period. At no time during the tax period did the price of raw sugar rise quite as high as it had risen a year before the tax period. In May, 1935, during the tax period, the price went up to $3.11; but in July, 1933, before the tax period, it had gone up to $3.17. The record does not show, and we need not inquire, what did cause any of the increases in the price of raw sugar. The causes may have been, for example, reduced acreage, poor crops, wage increases, or combinations among sugar growers. The historical evidence that the tax caused none of the increases is re-enforced by theoretical considerations. The tax was no part of the costs which producers of, or dealers in, raw sugar had to meet. Though a substantial tax on processing necessarily tends to cause, as it caused in this case, a substantial increase in the price of *refined* sugar, its normal tendency would seem to be to depress the price of raw sugar.[19]

With respect to the 15 per cent of claim-

[17] Note 5 supra. Cf. United States v. Jefferson Electric Mfg. Co., 291 U.S. 386, 405–406, 54 S.Ct. 443, 78 L.Ed. 859.

[18] In May, 1935, the price of raw sugar was 82 cents higher than when the tax took effect in the United States and 89 cents higher than when it took effect in the Philippines. The tax was 53½ cents throughout the tax period.

[19] If the increase in the price of refined sugar had been due to an increased demand for refined sugar, that demand

ant's product which it sold in the Philippines, the case is not materially different. (1) According to the record, the market price of refined sugar in the Philippines between September 12, 1934, when the tax of 53½ cents took effect there, and the end of September was $4.1593. This was exactly 53½ cents higher than the price between September 1 and September 11. It seems apparent that the increase was due to the tax. Afterwards the price fell to $3.85, but rose again to $4.07, during the tax period. There is nothing to suggest any connection between the tax and these later fluctuations in the price of refined sugar. There was nothing unusual about them.[20] While they were taking place, the tax remained stationary. (2) There is nothing to suggest that the tax caused any increase, at any time, in the price of raw sugar for manufacture for Philippine consumption. Between September 12 and the end of September that price, $2.38, was about 8 cents higher than it had been between September 1 and September 11.[21] But larger price changes than that were frequent. From July to August, 1934, while the tax was not yet in effect in the Philippines and remained unchanged in the United States, the price of raw sugar had increased about 37 cents, from $1.91 to $2.28. In March, 1935, during the tax period, the price went as high as $2.54; but in February, 1934, before the tax period, it had gone as high as $2.92.

Though the court thinks the Commissioner's proof insufficient, the court does not suggest and I do not know how there could ever be clearer proof that, despite a decline in a processor's margins, he shifted the entire tax burden. In specifying means by which the presumption based on margins might be rebutted, "we do not think that Congress was attempting to require the impossible." [22] Even if the evidence were insufficient to compel an affirmative finding that claimant shifted its entire tax burden,[23] the result of the case should be the same. For the Act of Congress does not require the Commissioner, in order to defeat the claim to a refund, to prove that claimant shifted the burden of the tax. It requires the claimant, in order to establish its claim to a refund, to prove that it did not shift the burden of the tax. For that conclusion, the evidence furnishes no rational basis. To say this is to contradict neither the Board nor this court. There has been no finding that the evidence alone is sufficient to support that conclusion. The principle of administrative finality,[24] as I understand it, does not require or permit this court to sustain a decision which has no rational basis in the evidence and is based upon an error of law.

---

would of course have tended to increase the demand, and therefore the price, of raw sugar. But this fact has no bearing on the question of the effect, upon the price of raw sugar, of an increase in the price of refined sugar due to a tax (or other expense) which is imposed upon refining or refined sugar but not upon raw sugar. Although the demand for sugar may be relatively inelastic, a substantial increase in the price of refined sugar, such as this tax caused, must tend in some degree to reduce the effective demand for refined sugar. This in turn tends to reduce the demand for raw sugar, and therefore the price of raw sugar.

[20] In 1933, when the tax was not in effect, the price fluctuated between $3.66 and $4.16.

[21] The price was $1.77 in May and $1.75 in June. The tax took effect in the United States on June 8.

[22] Anniston Mfg. Co. v. Davis, 301 U. S. 337, 355, 57 S.Ct. 816, 81 L.Ed. 1143.

[23] Cf. United States v. Jefferson Electric Mfg. Co., 291 U.S. 386, 405-406, 54 S.Ct. 443, 78 L.Ed. 859.

[24] Dobson v. Com'r of Internal Revenue, 320 U.S. 489, 64 S.Ct. 239; Com'r of Internal Revenue v. Heininger, 320 U. S. 467, 64 S.Ct. 249.